The People of the State of New York, Appellant, *v.* Joseph Powell, Henry Lee, Sandra Love, Lisa Arnold, Deonilda Frank, Marcelle Thomas, Mary Townsend, Naomi Bostick, Robbie Taylor, Beverly Massey, Winnie Jones, Sandra Newland, Linda Ranson and Alberta Stokes, Respondents.

First Department, March 25, 1971.

178

*Alan D. Singer* of counsel (*Burton B. Roberts, District Attorney*), for appellant.

*Arnold E. Wallach* of counsel (*Rubin, Gold & Geller*, attorneys), for Joseph Powell and others, respondents.

*Louis L. Schwartz* for Sandra Love, respondent.

*Arthur J. Perry* of counsel (*Perry & O'Rourke*, attorneys), for Mary Townsend and another, respondents.

*David Bernheim* of counsel (*Henry B. Rothblatt*, attorney), for Winnie Jones, respondent.

*Jack Minoff* for Sandra Newland, respondent.

McGIVERN, J.   The People appeal from an order of the Supreme Court, Bronx County (BRUST, J.), entered June 18, 1970, granting defendants' motions to suppress narcotics evidence as having been obtained as a result of illegal search and seizure.   We disagree and would deny the motions.

Since the latter part of October, 1969, the police of the Narcotics Division had been conducting an investigation into the activities of one Beverly Massey, a known figure in the illegal narcotics trade.   Surveillance began with the receipt of a phone call on October 24, 1969.   That informant gave the names and addresses of four women, all involved in narcotics, two of whom were "mill operators".   All four of them are now among the 15 defendants arrested in a police sortie of January 23, 1970.

On the day before the disputed arrests and seizures, the police obtained a search warrant.   Originally, the District Attorney took the position that the warrant was valid, but during the hearing and before the court made a final disposition, he conceded it to be void.   As such, and since the briefs treat the warrant as void, the validity of the warrant is not before us on this appeal and we are called upon to make no ruling in respect of it.   As appellants, the People pray only that the order of suppression made by the court below be reversed and the motions to dismiss be denied.

Before the arrests, which were made on January 23, 1970, the police had acquired much information concerning the premises and the suspects. As an illustration, and as stated by Detective Strano, Beverly Massey had previously been seen in conversation with known violators, one of whom had previously been arrested inside of premises used for processing heroin. And further, based on protected information, he had reason to believe that Beverly Massey was processing heroin in Apartment 3H, Loring Place, Bronx, occupied by one Tessie Trueheart, the lessee and tenant, whose identity had been checked out by the police, and to which apartment the police had previously trailed Beverly Massey and her cohort, Naomi Bostick, also a known mill operator.

In view of such prior police information and knowledge, combined with their observations on the morning of January 23, 1970, we find that even without the warrant, concededly void, there was sufficient evidence to sustain a holding of probable cause, and to justify the arrest of the defendants and the seizure. The observation of the officers, experienced in narcotics detection, after prolonged investigation, substantiated their prior information or reasoned beliefs that the defendants actually were engaged in criminal activities. (*People* v. *Richardson,* 36 A D 2d 603; *Smith* v. *United States,* 385 F. 2d 34, 37.) Under these "exigent circumstances", the entry was legal and the arrest was proper. (*People* v. *McIlwain,* 28 A D 2d 711; see, also, *Draper* v. *United States,* 358 U. S. 307; *People* v. *Richardson, supra.*) And upon entry, the officers found the defendants processing 10 pounds of heroin for street sale, in 15,000 glassine envelopes. No small operation. And the contraband and the paraphernalia of their nefarious trade were all openly exposed on the table, the defendants engaged in a combined operation. Although the articles seized are not to be regarded as an element of probable cause, we may note the nature of them.

In determining the issue of probable cause, consideration must be given to the facts existing on the morning of January 23, 1970: the prior confidential information and concerted study, the coming together in an early Friday morning of known purveyors, mill operators, numerous females converging for a rendezvous in an apartment, where occupancy had been verified, the apartment to be used that day as a narcotics mill, as it had been so used before. And some of "the girls" had been seen previously, some that morning, in the company of the known mill operators, some of them with short hair and

in the esoteric garb of men's clothing. It is 7:55 A.M. The sight of so many "girls" up betimes, in that neighborhood, and in one place, standing by itself alone, would come under the heading of "unusual activity". (*People* v. *Hendricks,* 25 N Y 2d 129.) Then, on the scene there appears a stranger, Joseph Powell, in a Buick, with an out-of-State license plate. Emerging, he stands at the trunk of the car, his arms folded, and gazes around "for approximately five minutes, looking both up and down the streets as if he were waiting to go in". He is joined by Beverly Massey. They converse. They both reconnoiter. Together, they remove from the car trunk a suitcase, a cardboard box and a brown paper bag, and carry them into the building. Courts should not be blind to the plain implication of such a street scene. At this point, any ordinarily alert detective could have had "reasonable ground or probable cause * * * that is, observations or information sufficient to move a reasonable man to conclude that a crime is being committed or attempted". (*People* v. *White,* 16 N Y 2d 270, 273.)

And, in judging the conduct of these six experienced officers that early January morning, we cannot dissever their activities from their prior information that Beverly Massey and Naomi Bostick were known mill operators and had used Apartment 3H before for their illegal operations. "They were sort of the bosses or the gatherers of the girls, to run these operations". So spoke veteran Detective McCrorie. Indeed, a detective testified that just before entry, he heard the name "Chalky", a sobriquet favored by both of them. And they were known to the narcotics detectives from "their police photographs of past arrests along with their yellow sheets". And it was also known by these knowledgeable officers that the women who worked for them often wore men's clothing. Thus, we must view the police sally as the result of an ensemble of facts, a composite of knowledge. Altogether, there certainly was that degree of "unusual activity" justifying a conclusion of probable cause. (*Spinelli* v. *United States,* 393 U. S. 410.)

The main error of the Trial Judge was that he made an excision of all knowledge prior to the concededly void warrant and refused to consider it. But, as stated by Chief Justice BURGER, then Circuit Judge of the District of Columbia Court of Appeals: "As we have often observed, probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the

'laminated' total ". (*Smith* v. *United States*, 358 F. 2d 833, 837, U.S.C.A., D.C., cert. den. 386 U. S. 1008.) And, as stated in *Brinegar* v. *United States* (338 U. S. 160, 175 [1949]): "In dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

Accordingly, based on a combination of all the known circumstances, a totality of the prior information and current observations, these street-wise detectives, in the light of their expertise, knew or had probable cause to conclude that mischief was afoot in Apartment 3H, and it involved contraband narcotics.

Thus, we would reverse so much of the order as was appealed from, on the law and facts, and deny the motions to suppress.

McNALLY, J. (concurring in result). The order should be modified on the law and the facts to deny the defendants' motion to suppress the evidence obtained as a result of the arrest, and as so modified, affirmed. The affidavit in support of the search warrant failed to state the underlying circumstances, and hence there is no factual basis therefor. (*People* v. *Hendricks*, 25 N Y 2d 129.) The District Attorney commendably and properly consented to the vacatur of the warrant. Nevertheless, the record establishes probable cause for the arrest of the defendants and the search incident thereto which yielded the evidence sought to be suppressed.

The District Attorney was entitled to sustain the arrest and search on evidence of the investigation of the police and their observations made on and prior to the date of the arrest, January 23, 1970. (*People* v. *Malinsky*, 15 N Y 2d 86, 96.) The evidence establishes that defendants, Beverly Massey and Naomi Bostick, during October, 1969 became subjects of investigation of the Special Investigation Unit of the Police Department which has jurisdiction of crimes involving narcotics. Said defendants resided at Apartment 2E, 866 Elsmere Place, Bronx County. After surveillance, on October 29, 1969, at Apartment 3G, 1764 Walton Avenue, Bronx County, Naomi Bostick and others were arrested. Naomi was arrested by Detective Joseph Strano. She then had in her possession 75 glassine envelopes of narcotics and was engaged in an operation described as a "mill". This involved the dilution of about one pound of heroin and packaging in glassine envelopes. During the days preceding January 23, 1970, Detective Strano

was in receipt of confidential information that a packing mill was to be put in operation on January 23, 1970 at Apartment 3H, 1874 Loring Place, Bronx County, which would involve activity by defendants Naomi Bostick and Beverly Massey. On the basis of such information, Strano on January 21, 1970 followed Beverly Massey from Elsmere Place to 1874 Loring Place, Bronx County. On January 23, 1970, commencing at 6:00 A.M., a number of detectives and policemen were stationed at and near 1874 Loring Place and 866 Elsmere Place. It had been ascertained that Apartment 3H of 1874 Loring Place was leased to one Tessie Truehart.

On January 23, 1970, the police observed many females, later fixed at 13, and males, entering 1874 Loring Place. Among them were defendants Beverly Massey and Naomi Bostick, and several females who had been observed by the police at 866 Elsmere Place, including defendants Marcelle Thomas and Robbie Taylor. At about 8:00 A.M., a Buick automobile with a New Jersey registration arrived and parked opposite 1874 Loring Place. The operator, a male, walked to the rear of the car and waited a few moments. At about 8:05 A.M., defendant Beverly Massey emerged from 1874 Loring Place, approached the Buick and engaged the operator in conversation. The operator opened the trunk and removed a cardboard box, a paper shopping bag and a valise which they carried across the street into 1874 Loring Place. Police had passed by and stationed themselves outside Apartment 3H and heard the voices of numerous females and names which had become familiar to them in the course of their investigation. At about 10:30 A.M., Naomi Bostick appeared at the premises with two shopping bags, was met by another female, and they both entered the building and the apartment.

Detective Strano testified as an expert on the packaging of narcotics the procedure observed was usually followed in the operation of a " mill "; the practice being to gather girls involved in the process at the apartment selected for the operation " before the junk got there "; that it is customary for the girl who ran the mill to meet the messenger bearing the narcotics. In this case, the girl was Beverly Massey.

It was the expert opinion of the police that prior to 1:00 P.M. on January 23, 1970, the mill was in full operation in Apartment 3H at 1874 Loring Place. Thereupon, they effected simultaneous entry through a window off a fire escape and a hallway door of the apartment. The entry exposed the defendants engaged in packaging 10 pounds of heroin, with paraphernalia

customarily used in such an operation. The defendants did not adduce any evidence.

Probable cause for the arrest and search here involved is that which would satisfy a reasonable, cautious and prudent police officer, with the knowledge, experience and expertise of the arresting officers. (*People* v. *Valentine*, 17 N Y 2d 128, 132.) The evidence clearly demonstrates a pattern of behavior and procedure followed by those engaged in the packaging of narcotics for users, including the employment of females involved in the traffic of drugs, their attendance at a selected site in advance of the delivery of the drugs involved, the delivery of the narcotics to Beverly Massey, the person in charge of the girls, and its immediate packaging. The concurrence of these events, in the opinion of one well versed in drug traffic, is hardly consistent with innocent or lawful activity. Here involved is abnormal activity, highly suspicious involving persons known to be engaged in the traffic of drugs reinforced by prior information of a packing mill. (*People* v. *Munger*, 24 N Y 2d 445, 452.) The informer's communication, in my opinion, together with the observations of the officers, established probable cause. (*People* v. *Smith*, 21 N Y 2d 698, 700.)

NUNEZ, J. (dissenting). On January 23, 1970 several police officers, armed with a "no knock" search warrant, raided Apartment 3H at 1874 Loring Place, Bronx, arrested 15 persons and seized more than 10 pounds of heroin and various items used to package and process heroin. Entry was effected by using a crowbar to open a window leading to the fire escape. Prior to trial the defendants moved to suppress the physical evidence on the ground that it had been obtained as a result of an illegal search and seizure. At the conclusion of the hearing the District Attorney properly and commendably conceded that the affidavit on which the warrant had been issued was legally insufficient and the warrant void. However, he sought to sustain the seizure of the evidence on the theory that the sum total of the knowledge possessed by the police immediately prior to their entry into the apartment gave them probable cause to believe that a narcotic mill was in operation at the raided premises.

The majority and concurring opinions lay much stress and justify the warrantless entry into this dwelling on the basis of prior acquired information. The sum total of such "prior acquired" or "protected" information and the twice asserted statement in Justice McGIVERN's opinion that Apartment 3H

had been "so used before" (for the processing of heroin) is Detective Strano's statement in his affidavit in support of the void warrant "I have received information from a reliable * informant * * * that Beverly Massi * * * has obtained apartment 3H in premises 1874 Loring Place * * * for the specific purpose of processing and packaging a narcotic drug, to wit: heroin, thereat."

There is not a single word in this entire record that this apartment had been "so used before" for the processing of heroin or indeed for any other purpose by any of those arrested. No illegal activity in or about the apartment was observed. The informant did not say that he had ever been in the apartment, he had not seen any defendant in possession of narcotics; he had made no observations, nor had he overheard any conversations that would make the apartment suspect. His information was nothing more than a tip.

The majority opinion is most entertaining but quite inaccurate. As an illustration, the statement: "Before the arrests * * * the police had acquired much information concerning the premises. * * * As an illustration * * * Beverly Massey had previously been seen in conversation with known violators, one of whom had previously been arrested inside of premises used for processing heroin" is unfair and misleading. That someone had been previously arrested inside of *other* premises used for processing heroin in no way illustrates "that the police had acquired much information concerning the [raided] premises".

All of the activity of the police prior to January 23, 1970, their investigations, their observations, concerned premises other than Apartment 3H. The only observations made of this apartment were those of the 23rd as testified to by the police: At approximately 7:45 A.M. the defendant Ann Brown was observed entering, not the raided apartment, but the Loring Place apartment house. Numerous other females were also seen entering the building, several of whom were recognized by the police as having been seen in the presence of Naomi Bostick and Beverly Massey on previous occasions. At 8:00 A.M. an automobile bearing New Jersey license plates parked near the raided premises. The defendant Powell emerged, walked to the rear of

---

* At the hearing it was established that the informant was *unreliable*. While three defendants had been arrested in one case on his information, no convictions had resulted. Furthermore, the evidence shows that just one week before Strano applied for the warrant, the same informant had given the police erroneous information and that he had confessed to Strano that he did not know "what had happened", i.e., why his information had been incorrect.

the car and looked around. Beverly Massey was then seen emerging from 1874 Loring Place. She approached Powell and talked to him. They then looked up and down the street; Powell opened the trunk of his car and removed therefrom a shopping bag, a brown cardboard box and a suitcase. He and Beverly Massey carried these articles into the building. Three police officers testified at the hearing that they formed an opinion that Powell had narcotic drugs in the suitcase, namely heroin, along with paraphernalia for bagging. They admitted, however, that there was nothing about the suitcase, the box or the shopping bag to indicate that they contained narcotics. At 10:30 A.M. Naomi Bostick arrived carrying two shopping bags of food and entered the apartment building. It was approximately 1:00 P.M. when the police broke into the apartment. Concededly, no observations of the activities within the apartment were made until the police had forced their way inside and were well within the apartment. After an exhaustive hearing, the experienced Trial Justice concluded that on the totality of the evidence the police did not have probable cause to believe a crime was being committed and suppressed the seized evidence. We agree with that determination.

The unidentified informant had furnished erroneous and unproductive information only a few days prior to the arrest of these defendants. The informant made no reference to an automobile, did not assert that a man would bring the contraband and was apparently completely unaware of Powell's identity. The activities observed by the police on January 23 were unremarkable. They were consistent with thousands of similar innocent vignettes that take place on the streets of large cities every day. The observed acts were susceptible of many innocent interpretations, " even between persons with a narcotics background " (see *People v. Brown*, 24 N Y 2d 421, 423 [1969]). The behavior, at most " equivocal and suspicious " was not supplemented by any additional behavior raising " the level of inference from suspicion to probable cause " (see *People v. Corrado*, 22 N Y 2d 308, 311, 313 and *People v. Brown, supra*).

The majority's action in reversing the findings of the able Trial Justice is directly contrary to the very recent (1969) ruling in *People v. Brown* (*supra*) where the Court of Appeals (p. 424) said: " The logical and practical problem is that even accepting ungrudgingly, as one should, the police officer's expertness in detecting a pattern of conduct characteristic of a particular criminal activity, the detected pattern, being only

the superficial part of a sequence, does not provide probable cause for arrest if the same sketchy pattern occurs just as frequently or even more frequently in innocent transactions. The point is that the pattern is equivocal and is neither uniquely nor generally associated with criminal conduct, and unless it is there is no probable cause.''

The argument of the District Attorney that the police had probable cause to enter the dwelling in question is clearly an afterthought. The police would not have congregated in the vicinity of this apartment armed with crowbars and shotguns if they had not also been armed with their authority to enter without knocking, i.e., the invalid search warrant. Detective Strano so testified: '' he [referring to another detective] wanted to look at the door and see how many locks *to execute our warrant* and make the arrest.'' (Emphasis added.) The authority for the search being illegal, it necessarily follows that the search itself is illegal and the seized evidence must be suppressed (Code Crim. Pro., § 177; e.g., *People* v. *Loria*, 10 N Y 2d 368, 373; *People* v. *Brown, supra*).

The information received from the informant having been unreliable, the fact that activity consistent with a tip actually took place, does not establish probable cause unless there was something unusual about the activity (*Spinelli* v. *United States*, 393 U. S. 410). New York law is to the same effect. In *People* v. *Corrado* (22 N Y 2d 308, *supra*) the police received a tip from an undercover police officer that a pound of marijuana would be passed on the corner of Kings Highway and East 16th Street between 9:00 p.m. and midnight. At 9:30 p.m. the police observed the defendant alight from an automobile and walk over to another automobile. He re-entered the car in which he arrived and handed four opaque manila envelopes to the driver. The Court of Appeals (p. 311) held that the conduct of the defendant which the police asserted '' would be characteristic of *modus operandi* used for a ' drop ' '', was at most equivocal and suspicious and ruled that the arrest and seizure were unlawful. Certainly the undercover police officer in *Corrado* was more reliable than the informant in the case at bar.

The facts in this record justify the conclusion that the defendants were engaged in loathsome, criminal activities. However, we cannot shirk our obligation to uphold the rule of law, distasteful as the result may be to us. It should be remembered that '' the worst criminal, the most culpable individual, is as

much entitled to the benefit of a rule of law as the most blameless member of society. To disregard violation of the rule because there is proof in the record to persuade us of a defendant's guilt would but lead to erosion of the rule and endanger the rights of even those who are innocent ". (*People* v. *Donovan* 13 N Y 2d 148, 154 [FULD, J.] ; quoted with approval in *People* v. *Mirenda,* 23 N Y 2d 439, 447 [KEATING, J., 1969].)

Since the search warrant was concededly void, it was no warrant at all and the police entered the dwelling, made the arrests and seized the evidence without a warrant. This fact alone compels suppression and affirmance. The officers were not responding to an emergency. They had the premises under observation for a period of about seven hours. The last observation was made at 10:30 A.M. The apartment was raided at 1:00 P.M. Certainly two and one-half hours was more than sufficient time for the sophisticated New York City police to obtain a valid warrant if the facts would support it. The police suspected a large scale " milling " operation. The defendants were not fleeing or seeking to escape. Indeed they could not, for the police had surrounded the premises. In similar circumstances the Supreme Court of the United States has held an arrest without a warrant illegal. See *McDonald* v. *United States* (335 U. S. 451, 454-455 [1948]) where the court stated: " Where, as here, officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search warrant. A search without a warrant demands exceptional circumstances. * * * We will not assume that where a defendant has been under surveillance for months, no search warrant could have been obtained. * * * We cannot allow the constitutional barrier that protects the privacy of the individual to be hurtled so easily. Moreover, when we move to the scene of the crime, the reason for the absence of a search warrant is even less obvious. When the officers heard the adding machine and, at the latest, when they saw what was transpiring in the room, they certainly had adequate grounds for seeking a search warrant.

" Here * * * the defendant was not fleeing or seeking to escape. Officers were there to apprehend petitioners in case they tried to leave. Nor was the property in the process of destruction nor as likely to be destroyed. * * * Petitioners were busily engaged in their lottery venture. No reason, except inconvenience of the officers and delay in preparing papers and getting before a magistrate, appears for the failure to seek

a search warrant. But those reasons are no justification for by-passing the constitutional requirement ''.

Justice BRUST's order of suppression should be affirmed.

MARKEWICH, J., concurs with McGIVERN, J.; McNALLY, J., concurs in result in an opinion, in which MARKEWICH, J., concurs; NUNEZ, J., dissents in an opinion, in which CAPOZZOLI, J. P., concurs.

Order, Supreme Court, Bronx County, entered on June 18, 1970, reversed, on the law and facts, and the motions to suppress denied.