■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GEORGE TINSLEY, Appellant.—Judgment entered in the Supreme Court, New York County, on April 30, 1973, convicting defendant upon his plea of guilty of felonious possession of a weapon and sentencing him to a term of five years probation, affirmed. The observations of defendant's conduct giving rise to the police officers' suspicion that defendant and his companions were looking for an appropriate place to commit robbery are stated in the dissent. The trial court credited the police officer's testimony. On the force seven years and assigned to the special anti-crime unit for two years, he had observed the pattern of conduct followed by the defendant and his two friends countless times, followed by 20 robbery arrests of persons engaged in such pattern of conduct. The record amply justifies the trial court's finding that the police officers acted as men of reasonable caution and had probable cause to follow the defendant and his friends and eventually stop and frisk them for weapons. Courts should not be blind to what is happening in our streets every day. We should learn from experience. As stated in *Brinegar v United States* (338 US 160, 175): "In dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." And as the police officer in *Terry v Ohio* (392 US 1, 21) this officer was "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." See, also, *People v Rivera* (14 NY2d 441, cert den 379 US 978), wherein the Court of Appeals upheld the seizure and immediate frisk of individuals who had approached a bar and grill in a high crime area at about 1:30 A.M., looked in the window, continued to walk a few steps, returned to the window, looked towards the police officers (who were in civilian clothes and sitting in an unmarked car), and walked quickly away. Based on their observations, these street-wise members of the special anti-crime unit, in the light of their expertise had probable cause to conclude that these three youths were intent on mischief. (See *People v Powell,* 36 AD2d 177, affd 30 NY2d 634.) Concur—Lupiano, Lane and Nunez, JJ.; Stevens, P. J., and Markewich, J., dissent in the following memorandum by Stevens, P. J.: I dissent and vote to reverse and grant the motion to suppress and would vacate the judgment and dismiss the indictment. This defendant entered a plea of guilty to possession of a weapon as a felony after denial of his motion to suppress a loaded pistol which was found upon his person. The facts leading to the incident were testified to at the suppression hearing by one of the arresting officers. To put the picture in focus, it is necessary to relate at some length his testimony.

This officer was a member of the anti-crime unit and on January 25, 1973, he was on patrol in a private car with a fellow officer. At about 2:15 P.M. he observed defendant and two other youths walking slowly north on the west side of Madison Avenue, looking into store windows. At 90th Street, they crossed to the east side of the avenue, continued north and midway in the block entered a liquor store, remained about one minute and left the store without a package. They continued walking on Madison Avenue and crossed over again to the west side of the avenue looking into different store windows as they walked. At 96th Street, according to the officer, one of the boys stood on the corner and the other proceeded north toward 97th Street. As the boys continued to walk on the avenue, the officer observed them enter a women's shoe store, remain a few moments and then come out. One of the officers entered the store, spoke to the manager and was informed that the youths had inquired about a pair of sneakers but had not purchased anything. (At this point, the officers were joined by a third officer in plainclothes and apparently the boys began walking south.) Near 90th Street, the officers observed the three boys looking into the window of a lingerie shop for a "couple of seconds." They then crossed the street and went into a drugstore, where they remained, again according to the officer, "maybe a couple of seconds," came out and continued walking south. The officers entered the drugstore and were told by a clerk that one of the three had inquired about the price of an athletic supporter which was on display in the window. The boys continued south on Madison Avenue to 80th Street, stood on the corner for a few minutes, and then the defendant and one of the boys walked into a hardware store, while, according to the officer, the third youth remained outside looking up and down the street. After about 20 seconds they came out, joined the third person and went to the corner of 83rd Street and Madison Avenue where they hailed a cab. The officers entered the appliance store and were told by the proprietor that he had been robbed. The officer asked the man was he sure because, according to the officer, "I had it before where they made mistakes like this." The man said, "No, I wasn't robbed, but these *three* fellows were in my store about three hours before and acted very suspiciously, asking about clock radios" and he was very suspicious of them and they left without buying anything. The officer testified that two boys had entered the store, but the owner is quoted as saying that three persons came in and had been there earlier and he was afraid he was going to be robbed. The officers left the store and entered their own unmarked vehicle and followed the cab carrying the three boys. The cab entered Central Park and proceeded in a westerly direction to 81st Street and Central Park West. At 81st Street and Central Park West, the three boys got out of the cab and started walking along 81st Street. When they had walked about 100 feet, the three officers surrounded the boys, ordered them into the hallway of 11 West 81st Street, directed them to place their hands against the walls and stretch their legs back, and searched them. A revolver was found in defendant's waistband. This defendant is aged 18 and his companions were aged 16 and 17. No inquiry was made as to what the youths were doing, or who they were, before they were searched. On cross-examination it developed that this was a Thursday afternoon, there was an average crowd on the street, and other persons in the stores, the vast majority of the persons were white. The court then asked if there were other black people in the area and received an affirmative answer. The defendant testified in his own behalf that he attended school that day from 8:30 to 11:30 A.M., that he formerly worked in the area where they were shopping, and that earlier that afternoon all three chipped

in to buy the gun from an addict as a novelty and something to have. From the officer's testimony, the action of the boys in walking up and down the street made the officers suspicious. They apparently had a hunch and acted on that hunch in searching the boys. The issue is whether there was justification and reasonable grounds for the search. Were there reasonable grounds for a belief that the defendant was involved in or about to become involved in criminal activity? Obviously this was not a stop and frisk, but a full blown search, for that was the term used by the officer. It does not appear, nor is it claimed that there was any apparent danger of physical injury to any of the officers or any apprehension on their part. In fact, at the time of the search, the three youths had left the commercial area and were walking in a residential area, more than a mile from where they had been first observed. Finally, there is no testimony that their manner was evasive or furtive. The single suspicious item seems to have been their walking up and down the street looking casually and briefly in store windows on a Thursday afternoon, entering several stores for very brief periods and inquiring about a pair of sneakers and an athletic supporter. CPL 140.50 (subd 1) permits an officer to stop a person in a public place, "when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct." In this case, according to the officer's own testimony, there was no inquiry made as to the name, address, or the conduct of the boys prior to their apprehension. It would seem to me that, on this record, neither the arrest nor the search was justified by reasonable suspicion on the part of the police. In *People v Johnson* (30 NY2d 929, 930) the court said: "Absent an articulate foundation for the entrenchment upon individual liberty and privacy which a stop and frisk entails, police suspicions remain merely 'hunches' and are not reasonable within section 180-a of the Code of Criminal Procedure [the predecessor of CPL 140.50]." The statement by the hardware store owner that he had been robbed, which was retracted when the officer made further inquiry, would not furnish sufficient reasonable grounds because it was ascertained that there had been neither a robbery nor indeed any threats. It would seem that the ethnic identity of these three boys is what really caused alarm because of the area in which they were walking. Certainly, window shopping is an old and time-honored pastime. There was no evidence in my opinion to support a belief that this defendant had committed or was about to commit a crime. Therefore, the seizure of his person and the subsequent search was an unjustified invasion of his Fourth Amendment rights. Certainly the record is barren of any objective evidence which indicates criminal activity *(People v Cantor,* 36 NY2d 106, 113; *Sibron v New York,* 392 US 40; *Terry v Ohio,* 392 US 1).