Walter T. Gorman, J.
The People move to resettle an order of this court suppressing wiretap evidence.
A lengthy hearing on defendants’ application to controvert five eavesdropping warrants culminated on December 15, 1975 with the granting of the motion and the suppressing of "all communications and evidence derived therefrom.” The decision resulted from the failure to timely seal the recordings as required by statute (84 Mise 2d 749, 755).
On December 31, 1975, acting upon the assumption that all evidence relating to the defendants had been suppressed, the People filed a notice of appeal and a statement that they could not proceed without the suppressed evidence (see CPL 450.50, subd 1). The indictment charged the defendants with conspir *739 acy in the first degree, criminal sale of a controlled substance in the first degree (three counts) and the third degree and related crimes.
Four months after the original order had been handed down, the instant application was filed. It seeks a clarification of . the language "evidence derived therefrom.” Specifically, it addresses itself to testimony concerning the four alleged narcotics sales and certain telephone conversations. The undercover police officer had given defendant Grace Simmons a telephone number where he could be reached. Both she and Morris called the officer at this number from their telephones during the time they were tapped. Thus, the conversations were recorded as part of the wiretap.
In their moving papers, the People state that an interpretation excluding this evidence from the ambit of this court’s order would make it possible for them to proceed against Grace Simmons and Albert Morris. Should this court so rule, the People indicate they would apply to the Appellate Division to withdraw those appeals (see CPL 450.50, subd 2). To date no appeal has been perfected and, conceivably, the case could not be heard before the September Term.
"Resettlement of an order is an inherent power of the court” (2 Carmody-Wait 2d, NY Prac, § 8:125, p 142). It constitutes a means of correction or clarification and cannot be used "to change or to amplify the direction of the court.” (Ruland v Tuthill, 187 App Div 314, 315; People ex rel. Novick v Novick, 27 AD2d 653; Long Is. Light. Co. v Lambert, 77 Misc 2d 511, 515.) Here, the People request an explanation of certain language in the order. Accordingly, this court views their application as a motion for resettlement and finds it to be an appropriate remedy.
The prayer for relief should have been made earlier, but, in its discretion, the court will allow it at this time. It should be noted that the law would not be circumvented thereby, since the People’s appellate rights have been preserved (see Matter of Huie [Furman], 20 NY2d 568, 572; Matter of Van Vleek, Inc. v Klein, 50 Misc 2d 622, 623).
In oral argument, defense counsel contended that the filing of a notice of appeal divested this court of jurisdiction. However, no judicial or statutory authority for that proposition was cited. The taking of the appeal "constitutes a bar to the prosecution of the accusatory instrument involving the evidence ordered suppressed” (CPL 450.50, subd 2). Had the *740 Legislature intended to completely strip the trial court of jurisdiction on all other matters, presumably, it would have adopted language to that effect (cf. CPL 170.20). In fact, at least one tribunal has held that the filing of such notice does not bar reargument in the lower court more than three months later (Matter of Van Vleck, Inc. v Klein, supra). It is. unnecessary to consider the powers of the trial court once the Appellate Division hears an appeal and renders a decision. The advantages of resettlement prior thereto include the prevention of a mistaken interpretation of the ruling, a better understanding of the decision by the reviewing courts and the parties, the avoidance of a remand later for clarification, and the possible saving of the time, work and expenses incurred in perfecting an appeal (cf. Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 2221, p 159).
The New York City Police Department and the Office of Prosecution of the Special Narcotics Parts conducted a two-pronged, seven-month, narcotics investigation, commencing in November, 1973.
The first, self-contained part of the investigation consisted of direct contacts by the undercover police officer with various parties. In November, 1973 he made three separate heroin purchases from Joseph Duffy and Earlene Jordan for $300, $2,600 and $5,000, respectively. He made an additional buy from them the following month for $20,000.
On January 15, 1974 the undercover met Duffy, Jordan and Kathy. They took him to a female they called "Grace” (Grace Simmons). The undercover spoke with her about being Shortchanged on the last Duffy-Jordan buy. Then she and the others present sold him another $20,000 package of heroin. (This sale is the subject of another indictment.)
Joseph Duffy remained the undercover’s contact. On February 8, 1974 they met and concluded arrangements for a $45,000 heroin sale to take place three days later. Duffy took the undercover to a street corner on February 11, 1974 tti consummate the sale. They met Grace Simmons there. The officer told her he had been unable to raise the money. She stated that she was prepared to make the sale immediately. They agreed to a smaller $20,000 purchase to take place two days later. On February 13, 1974, pursuant to the February 11 meeting, the undercover purchased narcotics for $20,000 from Duffy, Jordan, Kathy and Morris. (This sale is charged in the instant indictment.)
*741 On February 27, 1974, the undercover met Duffy and received a packet of heroin on the pretense that he would have to check its purity before buying a larger amount. The indictment accuses the defendants of this sale and two others on April 10 and April 25.
On March 22, 1974 the undercover officer met Grace Simmons and gave her a telephone number where he could be reached. Subsequently, she and Albert Morris called him many times.
Meanwhile, the police operation was simultaneously being conducted on a second level. On December 12, 1973, a Justice signed an eavesdropping warrant for Duffy’s telephone. The three prior narcotics sales contributed to the probable cause therefor.
From the overheard conversations, the police learned the first name (Salena), address, and telephone number of Duffy’s supplier. An eavesdropping warrant for her telephone was issued on January 11, 1974.
The police heard a female, later verified to be Grace Simmons, on the Salena wire on January 13, 1974. During the existence of this tap, numerous additional conversations between her and Salena were recorded.
As a result of the Salena tap, the law enforcement officials ascertained the full name, address, and telephone number of Grace Simmons.
The foregoing provided the probable cause needed for an eavesdropping warrant, effective January 30, 1974, of Grace Simmons’ telephone. During February, 1974, the police overheard many conversations involving all three defendants and other parties.
This tap enabled the police to learn Morris’s name, address, and telephone number and that "Hank” was James Simmons.
Separate eavesdropping warrants for the conversations of Albert Morris on his telephone and Grace and James Simmons on her telephone were issued on March 1, 1974. A final warrant covering calls of the Simmons’ on the same telephone was signed on April 9, 1974. Numerous conversations of the defendants were recorded. Included among them are the telephone calls made by Morris and Grace Simmons to the undercover from their tapped telephones.
According to the People, no evidence of James Simmons’ participation in the alleged crimes exists beyond the sup *742 pressed tapes. Therefore, the determination herein should have no effect on his case.
This court concludes that the narcotics transactions charged in the indictment, negotiations in anticipation thereof, and conversations of the defendants with the undercover police officer were not derived from the suppressed communications. Although actually contained in the recordings and, therefore, suppressed as part of them, these conversations are admissible on other grounds.
The narcotics transactions originated independent of the wiretaps and, consequently, did not result therefrom. On the contrary, the wiretaps were offshoots of the heroin sales. The undercover police officer purchased large amounts of heroin from various people even before the taps existed. These sales were self-motivated acts not evolving from any intercepted communications. Instead, the undercover’s activities provided the basis for the eavesdropping. Although defense counsel have been provided transcripts of the tapes, they have made no showing to the effect that any information in the recordings led, either directly or indirectly, to any dealings between defendants or their associates and the undercover. The overheard communications in no way affected, promoted, or caused the sales to occur. Their contents were not used to induce or force anyone to sell drugs. In fact, until the taps expired, no one was notified of their existence. No tangible evidence was seized and no search warrants were issued as a result of the eavesdropping. It did not cause the defendants to act; it only provided further evidence of their activities.
In suppressing these communications and "any evidence derived therefrom,” this court did not suppress proper police conduct which led to, rather than emanated from, the wiretapping.
Put in the most favorable light, from the defendants’ point of view, the recordings, at most, enabled the police to identify the defendants by true name and address. This information, however, neither led to any narcotics sales, nor produced any contacts, between the police and anyone else. Both Grace Simmons and Albert Morris personally met and conversed with the officer. Thus, their identification was independently ascertained.
Where a crime consists of "an independent and voluntary act * * * not induced by the wiretapping * * * and untainted by any overheard conversation”, evidence thereof should not *743 be suppressed (People v Munger, 37 AD2d 950, on app following remand, 24 NY2d 445, app dsmd 33 NY2d 576). In Munger, a bribe offer would not have taken place "but for” the illegal seizure of drugs; yet, the court found "it was attenuated so as to be purged of any taint” (id.; see Wong Sun v United States, 371 US 471, 477-478). Here, the case for admissibility is even stronger, for the record shows the sales and conversations were not even remotely products of the wiretaps.
Unlike the present situation, in People v Mendez (28 NY2d 94, 101, cert den 404 US 911) it was only "probable or at least possible” that the name of a female witness disclosed by an unlawful wiretap would have been discovered anyway. Nevertheless, the court held her responses to questioning not to be the fruit of the poisonous tree, based upon the nature of the evidence — testimony, rather than real evidence — and the factor that the questioning was "without confrontation of the witness with the fact of the wiretap or by like exploitation of the illegal act” (id. at 101; see People v Dentine, 27 AD2d 139, affd 21 NY2d 700, cert den 393 US 967; People v Scharfstein, 52 Misc 2d 976, 985). These guidelines were followed in the case at bar, which is one step removed from the Mendez facts, since the present police actions were based on " 'an independent source’ ” (People v Fitzpatrick, 32 NY2d 499, 506, cert den 414 US 1033, 1050). Thus, in other words, even though the identity of the defendants was learned from the recordings (see CPL 700.50, subd 3), that information was independently acquired by the undercover. Moreover, the preceding and intervening acts purged the transactions and conversations with the undercover officer of any possible taint.
Although not crucial to this decision, it should be noted that the eavesdropping, as far as the police knew, was proper. It was founded upon properly issued court orders and affidavits spelling out probable cause. Not until the authorities failed to timely seal the recordings from the initial wire, did they become subject to suppression. As "evidence derived therefrom,” the communications intercepted under the subsequent warrants, likewise, were tainted. However, it is undeniable that the police and prosecutor, although misguided, acted in good faith. In applying the exclusionary rule, courts have given that factor weight in determining attenuation (see Brown v Illinois, 422 US 590, 602-604; United States v Peltier, 422 US 531, 542; People v Martinez, 37 NY2d 662, 668).
*744 At first blush, it may appear anomalous to suppress communications with the undercover officer over tapped phones and then to hold these identical conversations untainted by the wiretap. However, it is not unusual for evidence to be inadmissible for one reason, and yet, admissible under a different theory (see People v Powell, 36 AD2d 177, affd 30 NY2d 634; People v Sturgis, 76 Misc 2d 1053, 1060-1061).
Here, the conversations with the undercover were not the result of the wiretaps. They were initiated by the defendants when they wanted to talk with him. That they were also taped, as part of the taps, was fortuitous. As eavesdropping evidence, these calls have been suppressed. As conversations overheard with the consent of the receiver (the undercover police officer), they no longer are "intercepted communications” and should not be suppressed (CPL 700.50, subd 3; United States v White, 401 US 745, 751; People v Brannaka, 46 AD2d 929; People v Einhorn, 75 Misc 2d 183, 187-188). Since no warrant was needed to record them, a defective warrant is merely surplusage.
In view of the foregoing, this court’s order dated December 15, 1975 is resettled to reflect that the term "evidence derived therefrom” as used therein does not include evidence of narcotics sales charged in the instant indictment, meetings of the defendants and others with the undercover officer, or telephone conversations and tapes of those conversations of the undercover speaking with Grace Simmons and Albert Morris.