Fuchsberg, J. (dissenting).
I must resist the decision in this case because I believe it tolerates trespass on two of our people’s fundamental rights: to be free from unreasonable seizures (NY Const, art I, § 12; US Const, 4th Amdt) and that of a defendant to present witnesses in his defense (US Const, 6th Amdt; Civil Rights Law, § 12).
The "stop” of the automobile in this case was, of course, a seizure (People v Ingle, 36 NY2d 413, 418, citing Terry v Ohio, 392 US 1, 16). As I view it, to uphold it under the circumstances here is to further whittle away our security (see dissenting opn in People v De Bour, 40 NY2d 210, 226 et seq.).
I had thought that in Ingle we made it clear that, while the peculiar considerations arising out of the need to insure highway safety and compliance with the provisions of our Vehicle and Traffic Law permitted routine traffic inspections for such things as equipment violations, provided the stops for that purpose were "nonarbitrary, uniform and systematic” and conducted at "roadblocks, checkpoints, weighing stations and the like”, a police stop of an automobile in any other way or any other circumstances, if not for reasonable cause, must at least be based on "reasonable suspicion”. In most explicit language we said that such a reason must be a "valid” one and that, when the stop is made "gratuitously or by individual discriminatory selection” or is otherwise "the product of mere whim, caprice, or idle curiosity”, it is interdicted. (People v Ingle, supra, pp 416, 420; accord People v Simone, 39 NY2d 818.)
Concededly, the stop in the present case was not for a *408 routine traffic check. And, if there was "suspicion” on the part of the officers, there is no basis, however frail, to which a finding that it was "reasonable” can attach. Not the slightest reason to suspect even a violation of a traffic regulation, much less that critilinal activity was afoot, has been offered. Certainly, none can be found in the bare assertion by the police that, two hours earlier, they had stopped a car of the same manufacture, model, color and vintage (variously described by them as blue or black in color and of 1963 through 1966 year of manufacture)[1] as the one in which the defendant Alonzo Singleton was stopped and that, since both cars looked alike, their suspicions were aroused by the fact that the registration plate they had observed on the car at the time of the earlier stop bore a number indicating it had been issued out of the Queens office of the State Motor Vehicle Department while the one they saw at the time of the Singleton stop carried a license plate emanating from the Brooklyn (Kings County) office. Significantly, other than its license plate, not a single thing by which an individual identification of the car could be made has ever been suggested, not so much as a scratch or an item of decor or an attached appliance. A Buick Riviera model of General Motors manufacture, there was apparently nothing about its appearance, or that of the two cars (for that is what they turned out to be) to separate it (or them) from the tens and tens of thousands of look-alike Rivieras that, figuratively, must have been poured out of an identical Detroit mold during the years 1963 through 1966.
Even the appearance of the occupants provided no reason for believing the two vehicles were the same. In both instances the color of their skin was black, hardly surprising in as polyglot a city as New York, but they did not look like the same individuals to the police; they were different in number too, two men in the earlier car and three in the one stopped later. It hardly needs to be pointed out that, unlike mass-produced cars whose manufacture with precise and interchangeable parts correctly makes us expect them to be and look identical, people are remarkable to us when they are carbon copies of one another. Thus, neither the fact that the cars were as alike as two peas in a multipead pod, nor that their riders were as individual as people usually are, could serve as a "valid” ground for the police suspicion.
*409 Specifically, it simply was not rational, and certainly not "reasonable”, to suspect that a wrongful change of plates had taken place merely because two Buick Riviera cars bore different license plates. In fact, it seems to me that debate on this point is precluded when one considers that one car was registered out of Brooklyn, the other out of Queens, that the stop did not take place in a rural or isolated area where Buick Rivieras were a rarity but while the car was en route from Manhattan to Queens, that these three contiguous boroughs of New York City were peopled at the time by well over six million[2] of that teeming metropolis’ eight million inhabitants and that many hundreds, if not thousands, of identical Rivieras[3] were no doubt plying its streets at that very time.
In short, there was no articulable reason to warrant elevating the action taken here beyond the level of whim, caprice or even worse, and the evidence derived therefrom should therefore have been suppressed and the indictment dismissed (People v Cantor, 36 NY2d 106, 114; People v Allende, 39 NY2d 474, 477). Automobiles play an important part in our society and many of our citizens spend a great deal of time in them. To sanction the stop here is to open the door to stops on unsupported suspicion, or even on prejudice, the common handmaiden of suspicion. (Cf. People v T., 48 AD2d 779, 781, revd on dissenting opn 39 NY2d 1028, where Presiding Justice Stevens had occasion to observe that "[i]t would seem that the ethnic identity of these three boys is what really caused alarm”.) One cannot help but wonder here, for instance, whether the stop and search of the first Riviera two hours earlier, and which turned out to be as fruitless of any discovery that the car had been stolen as it had in the Singleton case, was rationalized on the basis that a third Riviera had been spied before that one.
I turn now to Singleton’s compulsory process point. Singleton was a passenger in the car. It was operated by Joseph Powell. The second passenger was David Knowles. There was *410 never a direct inculpatory factual link shown between Singleton and the three eighths of one ounce of heroin, the aggregate quantity of drugs in the two small envelopes found in the car; the prosecution relied solely upon the presumption of possession provided against all occupants of automobiles by section 220.25 of the Penal Law (see People v Leyva, 38 NY2d 160). It therefore became important to Singleton’s defense that, if possible, he negate the effect of the presumption. To that end, it was not only natural but necessary for him to seek the testimony of Powell and Knowles, the only people who could shed light on the factual issue on the determination of which his guilt or innocence hinged. Indeed, it would have been hardly short of irrational for him not to call them as witnesses, especially since Knowles had previously pleaded guilty to the possession and, in doing so, in open court, had identified Powell as the owner of the drugs; neither had implicated Singleton.
As one would expect, both of these witnesses were subpoenaed for the afternoon the defense was scheduled to begin. However, neither witness responded to the subpoena, whereupon the defense brought the matter to the attention of the Trial Judge immediately. The Judge then adjourned the case until the following day in order that members of the defendant’s family could seek out the witnesses personally. They pursued that task assiduously; before that day was over they had located Knowles, who promised to appear the very next morning. But he did not keep that promise, so that defendant was required to make application to the court for material witness orders, which he did forthwith. Not surprisingly, the court found the application meritorious and granted it. The defendant lost no time in turning over the orders to the police for execution at once; that very night Knowles was taken into custody and held ready for production for the opening of court the next day. Unfortunately, however all these effots made on behalf of the defendant were thwarted when, as both parties to this appeal agree, later during the night of Knowles’ detention, upon erroneous and unauthorized advice from an Assistant District Attorney that the order under which Knowles was being held was defective, the police released the material witness and so could not produce him at the next day’s court session.
As soon as defense counsel learned what had happened, he advised the Judge of the problem with which the defendant *411 was not confronted and the court, after personally verifying the accuracy of this information by telephoning the Assistant District Attorney who had created the problem at 10:45 a.m. that day on its own initiative directed "the attorney for the defendant to go with members of the family [from the courtroom in Queens] to the District Attorney [in Brooklyn] * * * [to] see if * * * [the witness Knowles] can’t be picked up this morning” and declared a recess, presumably for that purpose, until 2:00 p.m. of the same afternoon. The defendant’s wife and his attorney spent the intervening hours doing exactly what the court had ordered, but their visit to the District Attorney’s office turned out to be a fruitless trek from which they returned empty-handed. The Judge then made the announcement that no further adjournment would be granted, since the term of the court at which he was then sitting was scheduled to end two days later. This took place only hours after the production of Knowles pursuant to the successful execution of the material witness order had been vitiated by the People’s agent. Defendant’s plight could hardly have been brought to the court’s attention more quickly or more clearly. Thus, by no standard is it possible to say that the defendant was afforded any meaningful opportunity to make the urgently needed efforts to fill the void which had thus been imposed on his case. Since Singleton had no one else to call, the net result was to compel him to conclude his case without the vital testimony of either Knowles or Powell.
The refusal to grant counsel a short adjournment violated appellant’s right to compulsory process under the Sixth Amendment and the New York Civil Rights Law. Perforce, it constituted an abuse of discretion. For "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense” (Chambers v Mississippi, 410 US 284, 302). As described in Washington v Texas (388 US 14, 19), "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant’s version of the facts as well as the prosecution’s to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution’s witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.”
Our own decision in People v Foy (32 NY2d 473) is premised on those principles. In that case, we held that the trial court *412 had abused its discretion as a matter of law by refusing to grant a short adjournment to enable the defense to produce two subpoenaed alibi witnesses who were referred to in counsel’s opening, one of whom had been in court on the previous day, a fact to be equated with that in the case before us, where but for the Assistant District Attorney’s unwarranted intervention, Knowles would also have been in court. Foy set forth the following guidelines: "(1) that the witness is really material and appears to the court to be so; (2) that the party who applies has been guilty of no neglect; (3) that the witness can be had at the time to which the trial is deferred” (32 NY2d, at p 476; see, also, People v Jackson, 111 NY 362).
Measured by these criteria, the trial court improperly denied counsel’s request for an adjournment as a matter of law.
As to the first requirement, every reasonable expectation was that Knowles’ testimony would assist the defense. Moreover, it borders on the redundant to point out that implicit, if not explicit, in the issuance of the material witness orders was a finding of materiality, a factual determination which, by the way, I would have thought to be beyond our review (NY Const, art VI, § 3).
In the circumstances of this case, it is therefore curious that the majority opinion would have the witnesses’ materiality vanish by excerpting an isolated comment by defense counsel, who had never spoken to either witness. Ignored by the opinion, for instance, is counsel’s express and uncontradicted statement that, in the allocution that accompanied Knowles’ plea, the latter had "told the Court that the drugs belonged to Joseph Powell and he knew that because he saw Joseph Powell buy the drugs and there was no implication at all of Mr. Singleton.”
As to the second guideline enunciated in Foy, granted Singleton’s truly Herculean efforts to produce Knowles, it appears impossible to understand how it can be contended that he shares any of the blame for the unauthorized release of his witness from the control of the police who were to see to his presence in court. It is even more incomprehensible that it should be seriously urged, consistently with either basic tenets of constitutional law or the most elementary standards of proximate cause, that, because Singleton absented himself from court on an occasion many months before his trial was held and an equally long time before the circumvention of the material witness order, he is to be deprived of an opportunity *413 to secure the attendance of witnesses essential to his defense at trial. Such an assertion, so belatedly invoking an impermissible and so devastating a sanction, may no more go unchallenged than should the result it is designed to support. In my view, injection of punishment for a legally unrelated event violates more than the rights of Singleton; it offends our broader responsibility for the preservation of the principle that "even the criminal most deserving of punishment is entitled, under our system, to a fair and impartial trial” (People v Herman, 255 App Div 314, 315; see, generally, 23 CJS, Criminal Law, § 961, esp pp 830-831).
Foy’s third requirement is equally met. Everything points to the fact that Knowles would have been produced had a reasonable adjournment been granted. His disinclination to flee the jurisdiction was established by the ease with which he had been found by the police despite the fact that he must have been aware that defense counsel, whose subpoenas he had twice ignored, had been seeking his presence at trial.
In the face of all this, it is remarkable that the majority opinion should find it necessary to engage in an illusory statistical exercise which essays an impression that the refusal to grant an adjournment came only after three earlier requests by the defendant had been granted. The crucial issue, of course, was not whether there had been one, two or three prior requests; that would make the pursuit of justice more like a numbers game. The question, rather, is whether, in the totality of circumstances here, Singleton should have been forced to trial without an adequate opportunity to present evidence required for his proper defense. Ironically, in order to reach its statistical figure of four, the majority opinion counts the events of the frenzied day when Singleton learned of the irresponsible release of his witness as two adjournments requested by him, when, according to the record, the one in the morning was on the trial court’s own initiative and the one in the afternoon was a sua sponte denial before the defendant had the opportunity to make any request. Indeed, the sequence of events was so rapid that only two days had elapsed from the time the witnesses had failed to appear in answer to the subpoenas on Monday until the time on Wednesday of the same week when the judicial pronouncement that there was to be no adjournment forced Singleton to rest his case.
In sum, there just is no room in this case for misinterpreta *414 tion of the standard laid down in Foy (32 NY2d 473, 478, supra), where, in the plainest of language, it was made clear that "when the witness is identified to the court, and is to be found within the jurisdiction, a request for a short adjournment after a showing of some diligence and good faith should not be denied merely because of possible inconvenience to the court or others.” That language fits this case like a glove.
Accordingly, were we not required, as I believe we are, to dismiss the indictment on the first ground, I believe we would be required to reverse and order a new trial on the second.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler and Cooke concur with Judge Jasen; Judge Fuchsberg dissents and votes to reverse in a separate opinion.
Order affirmed.

. The stop in this case occurred in 1971.

. According to the official 1974 New York State Legislative Manual (p 1228) the population of these three boroughs for 1970, the nearest tabulation date to that of the stop in this case, was 6,128,419. In addition, Bronx Borough (the stop here was made near the Triborough Bridge which connects Queens and Manhattan with The Bronx) had 1,471,701 residents at the time.

. Figures of the National Vehicle Registration Service (RL Polk & Co., Detroit, Michigan) disclosed that at approximately that time there were 43,534 Buick automobiles of 1963-1966 manufacture registered from Brooklyn, Queens and Manhattan alone. The several Buick models are not separately listed for statistical purposes.