THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROGER HICKS, Appellant.

Fourth Department, April 4, 1986

### APPEARANCES OF COUNSEL

*Susan V. Tipograph* for appellant.

*Richard J. Arcara, District Attorney (Louis A. Haremski* and *John J. De Franks* of counsel), for respondent.

### OPINION OF THE COURT

BOOMER, J.

On appeal from his conviction of robbery in the first degree, defendant asserts that the evidence used against him should have been suppressed as the fruit of an illegal detention. After a *Terry (Terry v Ohio,* 392 US 1) stop, the police returned defendant to the scene of an armed robbery for identification by the victims. We hold that under all the circumstances the limited investigatory detention and transportation were permissible and we affirm the conviction.[1]

I

The pertinent facts were developed at the suppression hearing. Shortly after 4 o'clock in the morning of November 12, 1981, Police Officer Murray Wright and his partner heard a report over the radio that a robbery had just occurred at the Worthington Compressor factory in the City of Buffalo. They immediately entered their patrol car and drove at a high rate of speed toward the factory, 1¼ miles away. En route they heard another broadcast that the robbers, two black men, both five feet, five inches tall, fled in a green Pontiac with black trim. Slightly over a minute after the first broadcast and when the police were one-quarter mile away from the Worthington factory, Officer Wright saw two black men in a grey and black sedan on the same street where the factory was

---

1. Thus, we decide the question expressly reserved by the Court of Appeals in *People v Brnja* (50 NY2d 366, 369).

located, coming from the direction of the factory. Both men were "sitting low in their seats" and appeared to be of the same height. Suspecting that they might be the robbers, Officer Wright turned on his flashing red light and "pulled the car over".

When he approached the stopped car, he noticed that the occupants were approximately the height described over the radio. In answer to the officer's question about where they had been, the driver replied that they had just left work at American Brass. Officer Wright knew that defendant could not have been coming from the American Brass plant because it was miles away in the opposite direction, so he ordered both men out of the car and frisked them for weapons. He then explained that there had been a report of a robbery at the Worthington factory and he was going to take them there for possible identification; if they were not identified as the robbers, he would let them go. He placed the passenger in the backseat of the patrol car and told defendant, the driver, to park his car at a nearby gasoline station. Defendant complied and then also entered the patrol car. Neither was handcuffed and both accompanied the police without protest.

Within 10 minutes of the stop, the patrol car arrived at the entrance to the Worthington factory where defendant was taken from the patrol car and identified by a security guard and two other Worthington employees as one of the two men who had committed the robbery and had stolen a safe. Following this identification, both men were arrested and the Buick was searched. Found in the trunk were the stolen safe, welding equipment the robbers used to cut the safe from its moorings, and the carbine and automatic pistol displayed during the robbery.

The People's evidence produced at the trial proved defendant's guilt beyond a reasonable doubt. The three Worthington employees testified to their hour-long ordeal. They were forced at gunpoint to lead both men to the payroll office, to assist them in using welding equipment to remove a safe from a metal cabinet, and to carry the safe and place it in the trunk of the Pontiac. They were then handcuffed to a railing inside the factory, and, as soon as the robbers left, they broke loose and called the police. Although both armed men wore masks over their faces, the employees identified defendant and his accomplice from their clothing, mannerisms, voices, and general appearance.

Defendant's accomplice told how he and defendant rented the welding equipment a day before the robbery; how they stole the green Pontiac which they drove to and away from the Worthington factory, abandoning it a short distance away where they had parked defendant's Buick; and how they transferred the safe, the welding equipment and the weapons to the trunk of the Buick.

The manager of a welding supply store identified defendant and his accomplice as the men who came to his store and rented the welding equipment. He also identified the Buick as the car defendant drove to the store. He explained that as defendant drove away, he went outside the store and wrote the license plate number on the rental agreement.

Other items of incriminating evidence were defendant's fingerprints discovered on the metal cabinet from which the safe was taken and also on the side of the stolen Pontiac, a handcuff box found in the pocket of the accomplice, the mask left by defendant in the patrol car, and rubber gloves, similar to those worn by the robbers, found in the front compartment of defendant's Buick.

## II

Defendant's principal argument is that, lacking probable cause for an arrest, the police seized him in violation of his rights under the 4th Amendment by placing him in the patrol car and driving him to the scene of the robbery; and as a consequence, the identification testimony of the three Worthington employees and all of the physical evidence were inadmissible.

As stated by the United States Supreme Court, the 4th Amendment is not a guarantee against all seizures but only against *unreasonable* seizures *(United States v Sharpe,* 470 US —, —, 105 S Ct 1568, 1573). In evaluating the reasonableness of the investigative detention in this instance, we must use a dual approach and examine " 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " *(United States v Sharpe, supra,* p —, p 1573, quoting from *Terry v Ohio,* 392 US 1, 20, *supra.)*

## II A

An investigative detention is justified at its inception when,

based upon the "totality of the circumstances—the whole picture—", the police have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *(United States v Cortez,* 449 US 411, 417-418.) It cannot be seriously questioned that the stop of defendant was justified. Considering the whole picture, Officer Wright had a particularized and objective basis for suspecting that defendant had participated in the robbery at the Worthington factory. The defendant and his accomplice matched the general description of the two robbers as reported by radio. "Critically, the crime and subsequent stop took place at an early morning hour when there was little motor vehicle traffic. This is recognized as a significant factor justifying a stop upon much less comprehensive information than would be adequate were the stop made at midday". Timing and location are of "crucial importance" *(People v Johnson,* 102 AD2d 616, 622-623). Here, defendant was stopped only a short distance from the scene of the robbery, within minutes after it occurred, and as his automobile was traveling away from the place of occurrence.

Although the automobile did not fully match the description given over the radio,[2] nevertheless, the totality of the circumstances supported a reasonable suspicion that the occupants had committed the robbery. As stated by Professor LaFave: "[T]he investigating officers must be allowed to take account of the possibility that some of the descriptive factors supplied by victims or witnesses may be in error * * * Moreover, account must be taken of the possibility that by a change of circumstances or efforts at concealment some aspects of the description may no longer be applicable * * * And even when an offender is known to have fled in one type of car it will sometimes be permissible to stop a suspect in a quite different style of vehicle because of the reasonable possibility that a switch of vehicles has been made" (3 LaFave, Search and Seizure § 9.3, at 88 [1978]).

## II B

The debatable question is whether the subsequent detention and transportation of defendant were "reasonably related in scope to the circumstances which justified the interference in

---

2. Although both were manufactured by General Motors, the getaway car was described as a green Pontiac with black trim and defendant's car was a grey and black Buick.

the first place." As stated in *United States v Sharpe (supra, p
—, p 1575), "[m]uch as a 'bright line' rule would be desirable,
in evaluating whether an investigative detention is unreason-
able, common sense and ordinary human experience must
govern over rigid criteria \* \* \* In assessing whether a deten-
tion is too long in duration to be justified as an investigative
stop, we consider it appropriate to examine whether the police
diligently pursued a means of investigation that was likely to
confirm or dispel their suspicions quickly, during which time it
was necessary to detain the defendant." The Sharpe* court
admonished that "[a] court making this assessment should
take care to consider whether the police are acting in a swiftly
developing situation, and in such cases the court should not
indulge in unrealistic second-guessing." *(United States v
Sharpe, supra,* p —, p 1576; *see also, United States v Montoya
de Hernandez,* 473 US —, —, 105 S Ct 3304, 3311.)

Under the test established by *Sharpe,* the detention was
reasonable in duration. By taking the suspects to the Worth-
ington factory a short distance away to determine whether
eyewitnesses could identify or exclude the suspects as the
perpetrators, the police diligently pursued a means of investi-
gation most likely to confirm or dispel their suspicions
quickly. The period of detention was short and it lasted no
longer than necessary to accomplish its purposes.

Nor did the procedure exceed the scope of a *Terry*-type
detention *(see, Michigan v Summers,* 452 US 692, 700-701, n
12). In *Summers,* the Supreme Court, quoting Professor La-
Fave, approved of various investigative techniques used in the
course of *Terry*-type stops, including the viewing of the suspect
by witnesses to the crime. If the matter is susceptible to quick
resolution by a prompt viewing by a victim or witness, "resort
to such procedures is to be preferred over other techniques
which are likely to be less conclusive and to require more
extended detention." (3 LaFave, Search and Seizure § 9.2, at
43 [1978].) Significant here is the fact that the initial inquiry
of defendant following the stop did not serve to allay the
officer's suspicions, but elevated them, justifying the continu-
ance of the investigative detention for a further limited period
*(see, United States v Montoya de Hernandez, supra,* p —, p
3311;[3] *People v De Bour,* 40 NY2d 210, 225;[4] 3 LaFave, Search

---

3. "Authorities must be allowed 'to graduate their response to the
demands of any particular situation.' *United States* v. *Place,* 462 U.S. 696,
709, n. 10".
4. "We are cognizant of the fact that police-citizen encounters are

and Seizure § 9.2, at 38-39 [1978]). When defendant told Officer Wright that he had been coming from work at American Brass and Officer Wright knew that American Brass was miles away in the opposite direction, he was justified in continuing to detain defendant for a prompt viewing by the victims of the robbery.

It should make no difference in this case that the police did not take the witnesses to the suspect, but instead took the suspect to the witnesses. "[I]t is not correct to assume that the intrusiveness of the suspect's detention may always be best limited by holding the suspect at the place of the stopping and then transporting victims and witnesses there." (3 LaFave, Search and Seizure § 9.2, at 44 [1978].) Professor LaFave cites a score of cases supporting his view that the transportation of a suspect a short distance to be viewed at the scene of the crime does not convert a *Terry*-type stop into an unlawful arrest *(see,* cases collected at 44-45, and 1986 Pocket Part, at 28-29, particularly *People v Lippert,* 89 Ill 2d 171, 432 NE2d 605, *cert denied* 459 US 841; *United States v Vanichromanee,* 742 F2d 340 [7th Cir]; *see also, People v Acevedo,* 102 AD2d 336, 340).

A few cases *(see, e.g., Commonwealth v Lovette,* 498 Pa 665, 450 A2d 975, *cert denied* 459 US 1178; *State v Crowder,* 1 Hawaii App 60, 613 P2d 909) take a contrary view, relying on *Dunaway v New York* (442 US 200). That reliance is unfounded. The *Dunaway* court held that, lacking probable cause, the police acted illegally in seizing the defendant and transporting him to police headquarters for custodial interrogation. The prosecutor had contended that the actions of the police were sanctioned by *Terry v Ohio (supra).* Rejecting this contention, the court said that *Terry* "involved a brief, on-the-spot stop on the street and a frisk for weapons, a situation that did not fit comfortably within the traditional concept of an 'arrest'." *(Dunaway v New York, supra,* p 209.) Since *Dunaway,* however, the Supreme Court, while reaffirming its holding that probable cause is an essential predicate for custodial interrogation in an institutional setting *(see, United States v Sharpe,* 470 US —, —, 105 S Ct 1568, 1574, *supra; Florida v Royer,* 460 US 491), has broadened the permissible scope of a *Terry*-type detention which requires only the lesser

dynamic situations during which the degree of belief possessed at the point of inception may blossom by virtue of responses or other matters which authorize and indeed require additional action as the scenario unfolds."

standard of reasonable suspicion. Limited intrusions need not be "confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams*" *(Michigan v Summers,* 452 US 692, 700, *supra; see also, United States v Sharpe, supra,* p —, p 1575).

Here, the transportation of the defendant to the Worthington factory was not significantly more intrusive upon his liberty than detaining him at the location of the stop to await the arrival of the victims *(see, People v Lippert,* 89 Ill 2d 171, 184, 432 NE2d 605, *supra).* Officer Wright and his partner were the first police officers to arrive at the Worthington factory. Had they waited for others to arrive and to transport the victims to the scene of the stop, they might have prolonged the detention. Considering the whole picture, the transportation of defendant to the scene of the crime was reasonably related in scope to the circumstances which justified the interference with his liberty in the first place.

## II C

The dissent relies upon *People v Battaglia* (56 NY2d 558, *revg* 82 AD2d 389) and *People v Henley* (53 NY2d 403) in support of the view that any nonconsensual transportation in a police car is equivalent to an arrest, which must be based on probable cause. *People v Brnja* (50 NY2d 366) expressly left open the question of whether detention and transportation for a prompt showup may be based upon reasonable suspicion. Neither *Battaglia* nor *Henley* discusses this issue, nor have they foreclosed an affirmative answer to the question.

In *Battaglia* (82 AD2d 389, 395-396, *supra),* the dissent, adopted by the Court of Appeals, started out: "The established rule that the custodial detention and *search of a suspect* without probable cause is an illegal invasion of his rights under the Fourth Amendment of the United States Constitution compels me to dissent" (emphasis added). Battaglia was not only put in the patrol car for transportation to the scene of the crime, but his pockets were searched. Clearly, it is established law that a detention for the purpose of a search of the person is illegal unless based on probable cause. It is not established, however, that a brief detention and transportation for the purpose of a prompt showup may not be based on the lesser standard of reasonable suspicion. In *People v Henley* (53 NY2d 403, *supra),* the transportation and detention exceeded reasonable bounds. Not only did the officer drive

Henley to the scene of the burglary of an unoccupied building, but, without probable cause, detained him further and drove him to his home.

There is a significant distinction between both *Battaglia* and *Henley (supra)* and the instant case. There, the police did not "diligently pursue * * * a means of investigation that was likely to confirm or dispel their suspicions quickly"; they detained the suspects hoping that somehow evidence would turn up to justify an arrest. Both cases involved a burglary of unoccupied premises. The police would not be likely to determine quickly whether the suspects had committed the burglaries by taking them to the premises because there was no indication that anyone was there who might identify the suspects.

Such was not the case here. The officers transported the suspects for one purpose only—to be viewed by the victims— and that purpose was clearly likely to "confirm or dispel their suspicions quickly". Moreover, they acted reasonably with complete regard for the rights and dignity of the suspects. There was no harassment, show of force, use of force, or actual physical restraint. The suspects were not handcuffed or mistreated in any way. Defendant was permitted to drive his car into a parking area and to enter the police car of his own volition. The officers explained the purpose of the detention and told the suspects they would be free to go if they were not identified. This is not the type of overbearing and illegal police conduct courts have been quick to condemn.

We all fear a police state; yet we desire police protection. A balance must be struck. In striking that balance certain principles have been established that safeguard our liberties and draw the line between reasonable and unreasonable police conduct. Certain police conduct is so intrusive that it is considered to be unreasonable unless founded upon probable cause. Without probable cause we may not be seized for the purpose of interrogation in a custodial setting, nor may our homes, persons or effects be searched. Certain lesser intrusions, however, are considered reasonable when based upon the lesser standard of articulable suspicion.

While State courts are free to interpret State Constitutions more restrictively than the Supreme Court has interpreted the Federal Constitution, we see no reason why we should do so here. We find no New York State policy that would be advanced by depriving our police of legitimate investigative

procedures necessary to apprehend criminals. Just as we should be quick to condemn illegal and overbearing police conduct, we should not preclude the reasonable police action taken in this case.

We share the concern of the dissent that we not erode the guarantees of the 4th Amendment. But " '[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.' " *(United States v Montoya de Hernandez,* 473 US —, —, 105 S Ct 3304, 3312, *supra,* quoting from *Adams v Williams,* 407 US 143, 145.)* While we must insist that no one, regardless of race or color, be detained on mere whim or caprice, or be searched or held for interrogation on less than probable cause, we must test the scope of lesser intrusions founded on reasonable suspicion by what is reasonable under all of the circumstances. Here, considering the whole picture, the limited intrusion upon defendant's freedom of movement was reasonable.

## III

We need mention only three of the remaining points. There was no indication that the conduct of the police in conducting the showup was in any way impermissibly suggestive. Moreover, procedures that are less than ideal may be tolerable in the interest of prompt identification *(see, People v Love,* 57 NY2d 1023).* After defendant was identified by the victims, the police had probable cause to believe that the safe and other physical evidence of the robbery could be found in his automobile. This justified the ensuing search *(People v Orlando,* 56 NY2d 441).* Finally, in view of the serious nature of the crime and defendant's criminal record, the sentence imposed is not harsh and excessive.

GREEN, J. (dissenting). We must dissent. At the moment the police stopped the car in which defendant and a companion were riding, the police had only the most general description of the robbery suspects—they were two black men of medium height and weight. The description of the getaway car, however, was very specific—it was a green Pontiac. Since the car that the police stopped was a grey Buick and since, in my view, the police reasonably could not have ascertained the height and weight of the occupants while they were riding in an unlit car at night, the only basis for the stop was that

defendant and his companion are black. Indeed, one of the arresting officers testified that prior to the stop defendant did nothing suspicious, violated no traffic regulation and did not take an unreasonable time to pull over the car. When asked by the prosecutor to describe the neighborhood in which the car was stopped, the officer replied "Well, it's—it's really an all white neighborhood and then to have colored people driving through at night, there's not too many."

A warrantless investigative stop of an automobile on a public roadway is a seizure violative of the 4th Amendment *(People v Ingle,* 36 NY2d 413, 418), unless it is based upon reasonable suspicion of criminal activity *(People v Singleton,* 41 NY2d 402, 405). Reasonable suspicion is present when an officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity [is] afoot" *(Terry v Ohio,* 392 US 1, 30). The race of a suspect, by itself, cannot provide reasonable suspicion to justify a stop and seizure by the police of that presumably innocent person *(see generally,* Johnson, *Race and the Decision to Detain a Suspect,* 93 Yale LJ 214 [1983]; *see also, People v George T.,* 39 NY2d 1028, *revg* 48 AD2d 779; *People v La Borde,* 66 AD2d 803, 804; *People v Bower,* 24 Cal 3d 638, 597 P2d 115; *Commonwealth v Bodden,* 11 Mass App 964, 417 NE2d 468). This is so because a racial description does not create suspicion of a particular person but only eliminates from suspicion all persons of another race.

In our view, a fair reading of this record reveals that defendant was stopped solely because he is black. If, for example, the race of defendant and his companion was Caucasian, or Oriental, or Mexican, or Puerto Rican rather than black—and all other circumstances were identical they would not have been stopped *(cf. Franklin v State,* 374 So 2d 1151, 1153-1154, *cert denied* 388 So 2d 1113 [Fla]). The arresting officer's testimony that he was suspicious because defendant was driving in an all white neighborhood is irrelevant. The infrequency of an event reveals nothing about its correlation with criminal activity *(see, People v George T., supra; People v Figueroa,* 58 AD2d 655, 656-657; *see also, Kolender v Lawson,* 461 US 352 [voiding for vagueness a California statute under which defendant, a law-abiding black citizen with a penchant for strolling through white neighborhoods, was detained or arrested 15 times in two years]).

*People v Johnson* (102 AD2d 616) is not to the contrary. There, the arresting officer knew that the *modus operandi* of a

robbery suspect resembled that used in a similar robbery the night before and the officer testified that defendant, a black man, looked "startled" and "shocked" before defendant's car was stopped. In *Johnson,* the defendant's race was only one of several factors which assisted the police in narrowing the scope of their investigation, while in the instant case defendant's race was the only articulable factor relied upon by the officers. In my view, the *Johnson* holding stretches to the outer limit of constitutionality and should be restricted to the unique facts there presented *(see, People v Parent,* 103 AD2d 617, 619). Indeed, as this court was careful to observe in *Johnson* "[a] person cannot be stopped by the police solely because he is black, no more than he can be stopped because he is Mexican-American or Puerto Rican. A person's racial status is neither an unusual circumstance nor probative of propensity to commit crime, and it does not provide a basis to conclude that crime is afoot" *(People v Johnson, supra,* p 622).

Even if it is assumed that the initial stop of defendant's vehicle was justified, his conviction must be reversed because the subsequent actions of the police in placing defendant in the patrol car and transporting him to the scene of the crime for a showup identification went beyond the permissible scope of a *Terry* stop *(see, Terry v Ohio, supra; see also,* Dix, *Nonarrest Investigatory Detentions in Search and Seizure Law,* 1985 Duke LJ 849, 900). Until today, the courts in this State have held that such police action must be supported by probable cause *(People v Battaglia,* 56 NY2d 558, *revg on dissent* 82 AD2d 389; *People v Henley,* 53 NY2d 403). We are at a loss to understand why the majority today is seeking to extend beyond their holdings certain cases recently decided by the Supreme Court in order to condone a seizure based on mere suspicion which exceeds in the level of its intrusiveness a similar seizure held impermissible, in the absence of probable cause, by the New York Court of Appeals *(see, People v Battaglia, supra).* The majority characterizes the invasion of defendant's constitutional rights in this case as a "limited intrusion", and then purports to find this "limited intrusion" permissible under recent decisions by the United States Supreme Court. There are two major defects in this reasoning.

Firstly, the Federal Constitution as interpreted by the Supreme Court is not the sole source of the fundamental rights of our citizenry. "State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law.

The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed" (Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv L Rev 489, 491 [1977]). Our State Constitution has in the past been found to afford greater protection against unreasonable searches and seizures than does the Federal Constitution *(see, People v Bigelow*, 66 NY2d 417; *People v Gokey*, 60 NY2d 309, 312; *People v Elwell*, 50 NY2d 231, 235). The Court of Appeals has frequently found that the State Constitution affords additional protections above the bare minimum mandated by Federal law *(see, e.g., Cooper v Morin*, 49 NY2d 69, 79; *People v Hobson*, 39 NY2d 479; *People v Settles*, 46 NY2d 154; *People v Singer*, 44 NY2d 241, 253; *People v Isaacson*, 44 NY2d 511, 519-520). On our view, NY Constitution, article I, § 12 prevents the police, acting on mere suspicion, from taking a citizen off the streets, placing him in a police vehicle, and transporting him to the scene of a crime for the purposes of undergoing a showup identification, a procedure which itself has been frequently condemned by the courts *(see, People v Adams*, 53 NY2d 241, 248-249).

Secondly, none of the Supreme Court cases cited by the majority compels the conclusion that that court would countenance the action taken by the police in this case. In *United States v Sharpe* (470 US —, 105 S Ct 1568), the Supreme Court held that detention of a suspected drug trafficker by the side of the highway for 20 minutes was not unreasonable since the delay was caused by defendant's own evasive actions. In *Michigan v Summers* (452 US 692), the Supreme Court held that a warrant to search for contraband implicitly carries with it the limited authority to detain the occupants of the premises while the search is conducted. The *Summers* court noted, however, that "[o]f prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself" *(Michigan v Summers, supra*, p 701). Similarly, the case of *Florida v Royer* (460 US 491) offers little, if any, support to

the majority's position. In *Royer,* the Supreme Court held that while detectives were justified in their initial stop of a suspected drug trafficker in an airport concourse, at some point after they asked him to accompany them to a room off the main concourse, and to open his luggage, "the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity" *(Florida v Royer, supra,* p 502). None of these cases give any indication that conveying a suspect in a patrol car to a showup identification is a permissible intrusion, absent probable cause *(see, United States v Brignoni-Ponce,* 422 US 873, 881-882).

Accordingly, the judgment must be reversed, on the law and facts, defendant's motion to suppress should be granted, and a new trial granted.

DENMAN, J. P., and SCHNEPP, J., concur with BOOMER, J.; GREEN, J., dissents and votes to reverse the judgment, on the law and facts, grant defendant's motion to suppress and grant a new trial in a separate opinion in which O'DONNELL, J., concurs.

Judgment affirmed.