*1061 OPINION OF THE COURT
Martin Marcus, J.
On January 20 and 23, 1995, a combined Mapp-Huntley hearing was conducted, in order to determine the admissibility of statements allegedly made by the defendant at the Bronx House of Detention and of palm prints taken from him at Jacobi Hospital.
At the close of the hearing, and after hearing argument from both sides, I rendered an oral decision concerning the admissibility of the defendant’s statements. Both sides stipulated that at the time of his statements, the defendant was incarcerated on a pending case on which he had counsel. For this reason, his right to counsel could be waived only in the presence of counsel. (People v Rogers, 48 NY2d 167 [1979].) Accordingly, even though Miranda warnings were first administered to him, his uncounseled waiver of his right to counsel was ineffective. Accordingly, I suppressed his statements. However, based on the finding that his statements were otherwise voluntary and were not coerced, I granted leave to the People to use the statements to cross-examine the defendant should he testify and a proper occasion for such use arise.
This written decision concerns the admissibility of the palm prints taken from the defendant. On this issue, the prosecution offered the testimony of Police Officer Eric Gallowitz and Detectives John Wynne and Joseph Miraglia of the New York Police Department, each of whom I found to be credible.[1] Based on the testimony adduced at the hearing, I find the following relevant facts. On November 11, 1992, Officer Gallowitz responded to a radio call of a burglary in an apartment building at 130 West 183rd Street in the Bronx. In the courtyard of the building, Officer Gallowitz found the defendant lying on the ground. At the same time, Officer Gallowitz received a radio transmission indicating that a male black had *1062 been in an apartment on the fourth floor, and while attempting to flee, had gone out of the window and fallen to the courtyard below. While Officer Gallowitz was still in the courtyard, Lance Holloway, the owner of the apartment, arrived there. Holloway confirmed the information already transmitted to Gallowitz and identified the defendant as the person who had fled from his apartment.
Officer Gallowitz placed the defendant under arrest for the burglary of Holloway’s apartment, and called for an ambulance. Once EMS arrived and placed the defendant in the ambulance, Officer Gallowitz attempted to obtain pedigree information from him. Initially, the defendant was belligerent and refused to give Officer Gallowitz his name. Gallowitz told the defendant that if he persisted in refusing to supply his name, "we [would] have to wait for fingerprints to come back and it would take a much longer time for him to be in the system.” The defendant then identified himself as "Lance Grey,” a name that ultimately proved not to be his. The defendant also told the officer that he lived at 2340 Belmont Avenue, but refused to give his date of birth. After the arrest, the defendant and Gallowitz separated, as the defendant was transported to Jacobi Hospital and Gallowitz drove to the 52nd Precinct to begin the paper work required by the defendant’s arrest.
Later that day, Detective John Wynne received information from Detective Dennis Antonucci of the Bronx Robbery Squad that a person named Lance Grey, who fit a pattern of burglaries in which Detective Wynne was interested, had been taken to the Bronx Municipal Hospital by the 52nd Precinct. Wynne’s interest in the pattern arose from the fact that he had been assigned to investigate one of the crimes included in the pattern, the burglary of an apartment on September 29, 1992, in which Ernest Botteon had been brutally murdered. The only identification evidence recovered at the scene was a bloody palm print.
On October 22, 1992, however, Wynne had learned from Detective Antonucci that the Botteon homicide was part of a pattern in which numerous burglaries had been committed in Bronx County dwellings by a person who in each case attacked an occupant present in the dwelling at the time of the burglary, beat the occupant savagely (or attempted to do so) and left the scene. It was Wynne’s intention to attempt to interview and take a "major case palm print” from anyone arrested for crime fitting the pattern. Detective Wynne was *1063 informed that the incident for which the defendant had been arrested was connected to the pattern because: it was a residential burglary; the complaining witness, Mr. Holloway, had been present at the time of the burglary; and the defendant had attacked Holloway, but because Holloway was "a little bigger and stronger,” the defendant "lost the fight and went out the window.”
Accompanied by Detective Joe Miraglia, Detective Wynne went to Jacobi Hospital on November 11. The next day, November 12, Wynne went back alone. On both occasions, Wynne was informed that he could not see the defendant. On November 13, Wynne’s regular day off, Detective Miraglia went to Jacobi without Wynne, was permitted to see the defendant, and took three sets of "major case palm prints” from him. The prints were taken to the Latent Print Department of the New York City Police Department, which determined that they matched the bloody palm print found in Botteon’s apartment.
The People assert that CPL 160.10 provides authority for taking the palm prints. Subdivision (1) (a) of that section requires the police to take fingerprints of anyone arrested for a felony.[2] Subdivision (2) provides that,
"In addition, a police officer who makes an arrest for any offense, either with or without a warrant, may take or cause to be taken the fingerprints of the arrested person if such police officer:
"(a) Is unable to ascertain such person’s identity;
"(b) Reasonably suspects that the identification given by such person is not accurate; or
"(c) Reasonably suspects that such person is being sought by law enforcement officials for the commission of some other offense.”
Finally, subdivision (3) provides that, whenever prints must be taken pursuant to subdivision (1), or whenever they may be taken pursuant to subdivision (2), "palmprints of the arrested person * * * may also be taken.”
The validity of the authority provided by CPL 160.10 depends, of course, on the lawfulness of the arrest pursuant to *1064 which palm prints are taken. (See, People v Gates, 24 NY2d 666, 670 [1969] [following Davis v Mississippi, 394 US 721 (1969), in holding that palm print evidence "is to be excluded if it be the product of an illegal arrest”].) In this case, Officer Gallowitz found the defendant injured in the courtyard and the complaining witness identified him as the person who had burgled his apartment and fallen from the apartment window. Obviously, there was probable cause for the defendant’s arrest, and the defendant does not contend otherwise.
The defendant’s reluctance to furnish his name to Officer Gallowitz could have provided Officer Gallowitz with the reasonable suspicion required for CPL 160.10 (2) (b) that the identification the defendant gave as Lance Grey was not accurate. And the similarity of the Holloway burglary to the other crimes in the pattern identified by Detective Antonucci did give Detective Wynne the reasonable suspicion required for CPL 160.10 (2) (b) that the defendant was the person he was seeking for the Botteon homicide. (See, People v Bush, 112 AD2d 1046, 1047 [2d Dept 1985] [holding that CPL 160.10 (3) "provides statutory authorization for the investigatory palm printing of a suspect legally in custody on another matter”]; People v Johnson, 102 AD2d 616, 624 [4th Dept 1984] [reasonable suspicion existed based upon a police officer’s assumption that the person responsible for two other holdups was also responsible for a similar robbery, since "(w)hether (the) assumption was true or false * * * it was a reasonable one to make, given the pattern of the crimes which he knew had only recently been committed”].)
The defendant nonetheless argues that his palm print was taken unlawfully because Detective Miraglia was not the arresting officer, and because Officer Gallowitz, who was, neither took the palm prints nor caused them to be taken. His argument, however, is flawed, since it rests on the erroneous assumption that the sole basis for taking the defendant’s palm prints may be found in subdivision (2) of CPL 160.10. Admittedly, that subdivision, under the three circumstances it specifies, explicitly gives fingerprinting authority only to the "police officer who makes [the] arrest”. Even assuming, though, that subdivision (2) should be interpreted to restrict its grant of authority only to the arresting officer, or to persons the arresting officer causes to take action, subdivisions (1) and (3) have no such limitation. According to subdivision (1), because the defendant was arrested for a felony, "the arresting or other appropriate police officer or agency” was required to *1065 take the defendant’s fingerprints or to cause them to be taken. And because his fingerprints had to be taken pursuant to subdivision (1), subdivision (3) provided that his palm prints "[could] also be taken”, without restricting the authority to exercise that permission to the arresting officer, or to any particular officer at all.[3] Thus it was lawful for Detective Miraglia to take the palm prints, even though Officer Gallowitz did not cause him to do so, and the defendant’s motion to suppress his palm prints is denied.

. The defendant also testified at the hearing on his own behalf. Relying in part on his own testimony, and in part on the testimony of Detective Miraglia, the defendant asserts that the People did not establish that he consented to the taking of the palm prints. Although their motion papers did allege, inter alla, that the defendant consented to the procedure, the People have now withdrawn that allegation. The defendant’s testimony has no other relevance to the issues raised by the palm prints. In any case, to the extent that his account of the taking of the palm prints differs from Detective Miraglia’s, I find Detective Miraglia’s account to be the credible one.”

. Fingerprinting is also required for a person arrested for a misdemeanor defined in the Penal Law, or for a misdemeanor not defined in the Penal Law which would be a felony if the person arrested had previously been convicted of a crime, or for loitering, or for loitering for purposes of prostitution. (CPL 160.10 [1] [b], [c], [d], [e].)

. The defendant relies on People v Bush (112 AD2d 1046 [2d Dept 1985]) for the proposition that only subdivision (3) of CPL 160.10 may be relied upon for the taking of investigatory palm prints. Bush, however, contains no such holding. It only notes that in that case, where an investigatory palm print was taken following the defendant’s arrest "on another matter,” subdivision (3) was "[d]irectly on point.” (112 AD2d, at 1047.) In any case, although the Court did not indicate what the other "matter” was, it may have been an offense for which subdivision (1) did not require fingerprinting. (See, n 1, at 1061, supra.) In such circumstances, palm printing would have been permissible pursuant to subdivision (3) only if fingerprinting was permissible pursuant to subdivision (2).